IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| M.F., on behalf of P.L. and R.L., a minor, and S.D. and D.D., individually and on behalf of a Class of persons similarly situated, | )<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | ) No. |
| MAGELLAN HEALTH, INC, SIMONE MC NEIL, and MICHAEL HOFFMAN, | )<br>)<br>)<br>) |
| Defendants. | ) |

## COMPLAINT

Now come the plaintiffs, M.F., P.L. and R.L., along with S.D. and D.D. ("collectively Plaintiffs"), by their attorneys, DEBOFSKY SHERMAN CASCIARI REYNOLDS, P.C., on their own behalf and on behalf of all others similarly situated, and complaining against the defendants, MAGELLAN HEALTH, INC. ("Magellan"), SIMONE MC NEIL ("McNeil") and MICHAEL HOFFMAN ("Hoffman") state as follows:

## NATURE OF ACTION

1. This case challenges the denial of health benefits and denial of claim appeal rights in relation to health benefits covering employees of the State of Illinois, retired employees, and their dependents ("Illinois Plan"), which are administered by Magellan.

2. Specifically, this case challenges certain practices by Magellan, on its own and on behalf of the Illinois Plan, applying clinical coverage criteria under the Illinois Plan that are inconsistent with generally accepted standards of medical care and treatment with respect to treatment for serious mental health conditions. In doing so, Magellan, acting on its own and on behalf of the

Illinois Plan, violated the requirements of the federal Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA") (29 U.S.C. § 1185a), the State of Illinois Parity law (215 ILCS 5/370c & 5/370c.1) and the United States Constitution by: (a) imposing restrictions for behavioral health treatment under the Illinois Plan that are more restrictive than care criteria utilized for comparable medical and surgical care; and (b) denying insureds their appellate rights under the Illinois Plan.

3.  Plaintiffs also challenge Defendants' failure to adhere to their published claim review process for denied benefits and, thereby, denied claimaints their right a full and fair review of denied claims.

## PARTIES

4.  M.F. and P.L., who are both residents of Chicago, Illinois, are married and are R.L.'s mothers. P.L. is disabled and is currently a State of Illinois retiree due to her disability. P.L. has provided power of attorney to M.F. Incident to P.L.'s employment with the State of Illinois, and her current status as a retiree, R.L. and M.F. received dependent health coverage under the Illinois Plan.

5.  R.L. is currently 16 years old and is a resident of Chicago, Illinois.

6.  S.D. is the parent of D.D. and lives within the Northern District of Illinois. Incident to S.D.'s employment status, he and his family, including D.D., received coverage under the Illinois Plan. S.D. was the policy holder and paid premiums in return for coverage.

7.  McNeil is the current Director of the Illinois Department of Central Management Services and has overall responsibility for the administration of health benefit plans for State of Illinois employees and retirees. Hoffman was McNeil's predecessor in that office, and some of the claims at issue occurred during Hoffman's tenure in office. At all relevant times, McNeil and

Hoffman were acting under color of law and within the scope of their employment. Plaintiffs bring suit aginst McNeil and Hoffman in their individual capacities.

8. Magellan is a corporation which does business throughout the State of Illinois as the administrator of various healthcare programs. At relevant times, the State of Illinois contracted with Magellan to manage and administer behavioral healthcare benefits under the Illinois Plan consistent with generally recognized standards of behavioral health care and treatment and in accordance with any applicable federal and state statutory requirements. At relevant times, Magellan was a State actor acting under color of law.

9. The Illinois Plan is sponsored by the State of Illinois for its employees, retirees, and their dependents. The Illinois Plan is a self-funded group health plan that offers various coverage options, the administration of which has been delegated to Aetna for medical, hospital, and surgical benefits, and, as alleged above, to Magellan for behavioral health benefits. This suit relates to claims for health benefits under the Illinois Plan.

## CLASS ACTION ALLEGATIONS

10 Plaintiffs bring this action individually and on behalf of all others similarly situated as a Class Action pursuant to Fed. R. Civ. P. 23.

11. Pursuant to Fed. R. Civ. P. 23(b), or, in the alternative, Rule 23(c)(4), Plaintiffs seek certification of a class defined as follows:

> All persons who received healthcare coverage under the Illinois Plan during the applicable limitations period whose claims for behavioral health treatment for serious mental illness were disallowed in whole or in part due to reliance on the MCG Guidelines* as the basis for making a medical necessity of treatment determination (the "Denied Benefits Class").

---

\* See Paragraphs 62-64 *infra.*

12. Pursusant to Fed. R. Civ. P. 23(b), or, in the alternative Rule 23(c)(4), Plaintiffs seek certification of the following additional class defined as follows:

> All persons who received healthcare coverage under the Illinois Plan during the applicable limitations period whose claims for behavioral health treatment were disallowed in whole or in part and who were subsequently denied the appeal rights enumerated in the Illinois Plan (the "Appeals Class").

13. Plaintiff and the other class members reserve the right under Fed. R. Civ. P. 23(c)(1)(C) to amend or modify the classes to include greater specificity, by further division into subclasses, or by limitation to particular issues.

14. This action has been brought and may be properly maintained as a Class Action under the provisions of Fed. R. Civ. P. 23 because there is a well-defined community of interest in this litigation and the proposed class is easily ascertainable.

## Numerosity

15. Plaintiffs have been informed and believe that the potential members of the proposed class as defined above are so numerous that joinder of all such members is impracticable.

16. While the precise number of potential class members has not been determined at this time, Plaintiff has been informed and believes that there are a substantial number of individuals covered under the Illinois Plan who have been similarly affected and whose identities may objectively be obtained by Defendants via their claims records, including billing codes submitted by medical providers.

## Commonality

17. Common questions of law and fact exist as to all members of the proposed class, including:

a. Whether Defendants' use of the MCG Guidelines in denying claims for behavioral health treatment for serious mental illness under the Illinois Plan was inconsistent with generally accepted standards of medical care and treatment for such conditions;

b. Whether Defendants improperly denied claimants their appellate rights under the Illinois Plan;

c. Whether Defendants violated State and Federal Mental Health Parity laws; and

d. Whether Defendants' conduct injured claimants.

### Typicality

18. Plaintiffs' claims are typical of the claims of the entire proposed class since they involve Defendants' use of the MCG Guidelines in place of generally accepted standards of care and treatment; and Plaintiffs and all proposed class members have been similarly affected by the conduct alleged herein.

### Adequacy of Representation

19. Plaintiffs will fairly and adequately represent and protect the interests of the members of the entire proposed class. Plaintiffs' counsel is competent and experienced in healthcare-related litigation and insured's rights under group health plans.

### Superiority of Class Action

20. A class action is superior to all other available means for the fair and efficient adjudication of this controversy. Individual joinder of all members of the proposed class is not practicable, and common questions of law and fact exist as to all class members.

21. A class action will allow those similarly situated persons to litigate their claims in the manner that is most efficient and economical for the parties and the judicial system. Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action

that would preclude its maintenance as a class action.

### Fed. R. Civ. P. 23(b) Requirements

22. Inconsistent or varying adjudications with respect to individual potential class members outside of the proposed class would establish incompatible standards of evaluating medical necessity for mental health treatment under the Illinois Plan and present a risk of conflicting and potentially life-threatening outcomes for persons covered under the Illinois Plan.

23. Adjudications with respect to individual potential class members would be dispositive of the interests of the other class members not parties to the individual adjudications and/or would substantially impair or impede their ability to protect their interests.

24. The administrator of the Illinois Plan has acted or refused to act on grounds generally applicable to the entire proposed class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the proposed class as a whole.

### Fed. R. Civ. P. 23(c)(4) Requirements

25. Alternatively, a class action would be a superior means of adjudicating the issue of whether the MCG Guidelines, as applied, are consistent with generally accepted standards of medical care and treatment for residential treatment in relation to mental health claims.

### STATEMENT OF FACTS

### R.L.'s Medical and Treatment History

26. R.L. has experienced a lengthy history of mental and behavioral health issues, and has been diagnosed with the following conditions: Disruptive Mood Dysregulation Disorder, Autism Spectrum Disorder, Attention Deficit Hyperactivity Disorder, Reading Disorder, and Learning Disorder. Due to the severity of R.L.'s condition, she has undergone multiple psychiatric emergency room visits, psychiatric hospitalizations, and intensive outpatient treatment, none of

which has been successful in controlling her behavior. R.L. has threatened her sibling with bodily harm and has destroyed numerous items of valuable personal property in her home. Her outbursts have necessitated police intervention, and she has even directed violent behavior toward law enforcement officers and others.

27. All outpatient treatment modalities and medications failed to improve R.L.'s mental health, and she has exhibited suicidal ideation, possible substance abuse, and dangerous sexual behavior, along with a complete lack of insight and coping skills. As a result, R.L. was placed in an intensive out-of-state therapy program. Following R.L.'s completion of that program, she was placed in a therapeutic boarding school; however, due to violent outbursts and attacks on staff members along with threats against other students, in June 2018, R.L. was discharged and admitted to the Logan River Academy in Utah on June 1, 2019.

28. Logan River Academy is a licensed and accredited residential behavioral health treatment center with an academic component.

29. Magellan initially approved coverage for the Logan River admission and deemed it medically necessary under the Illinois Plan, but coverage was discontinued as of July 5, 2019 even though R.L. had not completed treatment and was not yet capable of functioning at a less intensive or lower level of treatment without posing a significant risk of harm to herself and others. The rationale for discontinuing treatment; i.e., the criteria utilized to evaluate medical necessity for the continuation of treatment, i.e., the MCG Guidelines, is the basis of this lawsuit as to R.L. and similarly situated class members even though the Gudelines are inconsistent with generally accepted standards of medical care and treatment.

30. Magellan assigned a case number to this matter of 2016071306000560 and a claim number of 185192413.

31. Following the benefit denial, Plaintiffs attempted to pursue appeals but there was a complete lack of cooperation by Magellan. Further, despite notification by Magellan and in the Illinois Plan that appeals were to be submitted to Central Management Services ("CMS") for determination, efforts to appeal to CMS were initially ignored but deferred to Magellan.

32. On February 25, 2020, Plaintiffs were finally able to submit an appeal to Magellan; however, Magellan never acted on the appeal. Instead, Plaintiffs received a determination from an unknown, unnamed individual from the Medical Review Institute of America on April 16, 2020 upholding the claim denial, once again based on the MCG Guidelines. That determination was contrary to the evidence, inconsistent with the ongoing medically necessity of R.L.'s continued residential treatment, and based on medical necessity criteria that, as applied, are inconsistent with the terms of the Illinois Plan. Since no other avenues of appeal were indicated, Plaintiffs were left with no recourse but to initiate litigation against the entity that exclusively rendered the claim determination and the sponsor of the Illinois Plan.

### D.D..'s Medical and Treatment History

33. D.D., who was born in 2002, began experiencing defiant and angry behavior at the age of 11. In early 2014, D.D. began seeing a therapist, but his condition worsened. By the age of 13, D.D. began using marijuana and he became more angry and defiant. After starting high school, D.D. began abusing alcohol and would attend school drunk or high. D.D.'s condition worsened during his sophomore year of high school, and in addition to worsening substance abuse, D.D. began making suicidal threats, including holding knife to his wrists and wrapping one end of a cord around his neck and tying the other end to a door handle while threating to jump over a second story banister. He also began engaging in risky and violent behavior; and in addition to alcohol and marijuana, D.D. also experimented with hallucinogens.

34. In the Fall of 2017, due to his worsening condition, D.D. became unreceptive to therapy and in December 2017, a suicidal threat necessitated emergency room treatment followed by continued outpatient treatment and prescriptions for anti-depressant medication, which he refused to take. Notwithstanding continued outpatient treatment, D.D.'s behavior did not change – he continued to use illegal drugs, make suicidal threats, composed a suicide note and on several occasions performed violent and destructive acts

35. Due to D.D.'s refusal to accept therapy, medication or drug rehabilitation services, along with his continued drug use, depression and suicidal ideation, D.D.'s pediatrician advised that it was imperative and medically necessary for D.D. to be sent away for treatment – first at an outdoor treatment facility, followed by an appropriate long-term placement. D.D.'s treating psychologist concurred.

36. Because outpatient treatment had failed, at the recommendation of D.D.'s pediatrician and behavioral health providers, D.D. first was treated in a licensed outdoor treatment program with accompanying group and individual psychotherapy from June 26 – September 10, 2018, and he was then placed in a licensed residential treatment facility in Utah on September 10, 2018 where he underwent successful treatment until approximately June 20, 2019.

37. Defendants refused to provide coverage for the licensed outdoor treatment, falsely claiming they had not received D.D.'s "treatment records/documentation for the services billed on this claim in order to review the medical necessity of the services provided."

38. Conceding the impropriety of their position, Defendants agreed to reopen S.D.'s and D.D.'s claim. In connection therewith, S.D., again provided Defendants with D.D.'s treatment records and other relevant information.

9

39. Knowing that D.D.'s treatment at the licensed outdoor treatment facility was medically necessary, and consistent with generally accepted standards of behavioral health care and treatment, Defendants refused to render a determination on D.D.'s reopened claim. Instead, Defendants sought to settle the claim for pennies on the dollar while, at the same time, precluding S.D. and D.D. from exercising their published administrative appeal rights by not issuing a claim determination. Defendants engaged in their conduct in order to deprive S.D. and D.D. of their right of access to a claim appeal process. The matter was assigned claim number 180886671-3. The Member ID was W23265-12616.

40. Further conceding the medical necessity of D.D.'s licensed outdoor treatment and need for continued treatment in a residential treatment, upon release from the licensed outdoor treatment facility and at the recommendation of the D.D.'s therapist at that facility, Defendants, through Magellan, authorized residential treatment for the period September 10, 2018 through September 25, 2018.

41. Defendants, through Magellan withdrew authorization of D.D.'s residential treatment after September 25, 2018 even though D.D. remained under active treatment that was necessary for his improvement and well-being and was being administered under a program consistent with generally accepted standards of adolescent behavioral health care.

42. Despite the medical necessity for D.D.'s treatment after September 25, 2018 for multiple diagnoses under the *Diagnostic and Statistical Manual of Mental Disorders V,* which included substance abuse disorders,[1] D.D. was not authorized to receive treatment covered under the Illinois Plan after September 25, 2018 based on the MCG Guidelines even though Illinois state law mandated the use of guidelines promulgated by the American Society of Addiction Medicine

---

[1] There was also concern about substance abuse or at least the potential for substance abuse with respect to R.L. as well.

(215 ILCS 5/370c(b)(3)) in rendering medical necessity determinations; and in any event, as to each patient, medical necessity determinations need to be made in accordance with generally accepted standards of medical care and treatment.

43. To cover up and conceal their impermissible use of the MCG Guidelines, Defendants falsely made it appear as if the residential treatment facility failed to provide required information regarding D.D.'s treatment when, in fact, Defendants denied continued treatment before attempting to contact the requisite medical professional.

44. S.D. and D.D. subsequently appealed the denial of continued treatment. At Magellan's direction, the appeal was made to Magellan even though the procedures set forth in the summary plan required the appeals to be adjudicated by CMS.

45. This matter was assigned a claim number of 201402060600017770-002-0001-002. The Member ID was W23265-12616.

## COUNT I –
## DUE PROCESS
*Claim for Deprivation of Civil Rights in Relation to the Illinois Plan*
**(On behalf of the Denied Benefits Class)**

46. Plaintiffs reassert and incorporate by reference the preceding paragraphs as though fully set forth herein. Plaintiffs further allege as follows:

### JURISDICTION AND VENUE

47. Jurisdiction is based on 42 U.S.C. § 1988(a), which gives the district court jurisdiction over cases seeking vindication of civil rights.

48. Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391.

### RELEVANT PLAN PROVISIONS

49. According to the Illinois Plan, "medically necessary" or "medical necessity" is defined as follows:

11

> Health care services that we determine a Provider exercising prudent clinical judgment, would provide to a patient for the purpose of preventing, evaluating, diagnosing or treating an Illness, Injury, disease or its symptoms, and that we determine are:
>
> - In accordance with generally accepted standards of medical practice.
> - Clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for the patient's Illness, Injury or disease.
> - Not primarily for the convenience of the patient, Physician, or Other health care Provider.
> - Not more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of that patient's Illness, Injury or disease.
>
> Generally accepted standards of medical practice means:
> - Standards that are based on credible scientific evidence published in peer-reviewed medical literature generally recognized by the relevant medical community.
> - Consistent with the standards set forth in policy issues involving clinical judgment.

50. Because the Illinois Plan is offered by the State of Illinois, it is obligated to meet the requirements of the federal and State of Illinois parity laws, and offer coverage for mental health care that is equivalent to medical and surgical benefits and in accordance with generally accepted standards of medical care.

51. The MCG Guidelines are not expressly included in the Illinois Plan; and to the extent said guidelines as applied are in conflict with the terms of the plan, particularly, the definition of "medical necessity," the Illinois Plan terms and requirements must prevail such that benefits are administered in accordance with generally accepted standards of medical care and treatment.

52. At all times relevant hereto, the Illinois Plan was administered under the color of law; *i.e.*, the State of Illinois' statutes, administrative regulations, practices and policies that entitle State of Illinois employees, retirees, and their dependents the right to receive coverage for comprehensive medical and hospital treatment, including medically necessary behavioral health

12

treatment. State of Ilinois employees, retirees, and their dependents, such as Plaintiffs, who receive coverage under the Illinois Plan, like Plaintiffs, thus possess a property right protected by the Fourteenth Amendment to the United States Constitution to receive health benefits coverage that provides reimbursement for medically necessary treatment in accordance with federal and state statutory requirements. As a direct and proximate result thereof, the denial of benefits for R.L.'s, D.D.'s and all other class members' medically necessary treatment in accordance with Magellan's policy of utilizing MCG Guidelines to determine medical necessity of treatment and the Illinois Plan's deferral to the use of such a policy denied Plaintiffs their property rights in a manner that constitutes a deprivation of their civil rights under the Illinois Plan pursuant to 42 U.S.C. § 1983 and with respect to Magellan, a breach of their contractual right to receive benefits consistent with medical necessity and generally accepted standards of care.

53. At all times relevant hereto, Defendant Magellan is liable for the violation of Plaintiffs' constitutional rights by virtue of its policies, which included the use of the MCG Guidelines rather than the Illinois Plan to adjudicate claims for treatment of serious mental illnesses.

54. The actions complained of herein were undertaken pursuant to policies, practices and customs of Defendant Magellan, which were approved, encouraged and/or ratified by policymakers for Defendant Magellan and the other named Defendants who possessed final policymaking authority.

55. The policies, practices and customs described in this Complaint were maintained and implemented by Defendant Magellan with deliberate indifference to Plaintiffs' constitutional rights and was a moving force behind the violations of those rights.

56. As a direct and proximate result of Defendant Magellan's actions and inactions as described in this Complaint, Plaintiffs' constitutional rights were violated, and they suffered injuries and damages, as set forth in this Complaint.

57.     Plaintiffs were also guaranteed a full and fair review of benefit denials pursuant to the Illinois Plan; however, notwithstanding the stated role of CMS in that process, the Plaintiffs' right to a full and fair review was abridged by Magellan administering both the claims and appeals.

## RELIEF SOUGHT

WHEREFORE, Plaintiffs pray for the following relief:

A.      That the Court enter a judgment finding that R.L.'s residential treatment beyond July 5, 2019, D.D.'s treatment beyond September 25, 2018, and all other class members whose claim determinations were based on the MCG Guidelines and who were denied coverage for residential treatment and comparable services that were medically necessary was wrongful and contrary to the terms of the Illinois Plan, contrary to Illinois statutes and regulations pertaining to mental health coverage, and contrary to generally accepted standards of medical care and treatment, and thus violated Plaintiffs' right to receive medically necessary health benefits under the Illinois Plan pursuant to 42 U.S.C. § 1983;

B.      That the Court overturn the denial of coverage for class members' claims under the Illinois Plan and order Central Management Services and Magellan to reprocess those claims in accordance with generally accepted standards of medical care and treatment and in a manner consistent with the claims and appeals requirements of the Illinois Plan;

C.      That the Court enter a judgment requiring that mental health claims under the Illinois Plan be adjudicated under the terms of the Plan in a manner affording a full and fair review to claimants where the review is conducted by CMS rather than Magellan;

D       That the Court award Plaintiffs their attorneys' fees and costs pursuant to 42 U.S.C. § 1988(b); and

E.   That the Court award Plaintiffs any and all other relief to which they may be entitled, including interest on the medical payments Defendants forced them to make.

## COUNT II -
### *Mental Health Parity*

58.   Plaintiffs reallege and incorporate the preceding paragraphs as though fully set forth herein. Plaintiffs further allege as follows:

### STATEMENT OF FACTS

### Federal and State Mental Health Parity Laws

59.   MHPAEA prohibits group health plans sponsored by employers with 50 or more employees from imposing more restrictive treatment limitations on the coverage of mental health and substance use disorder treatment claims in comparison to medical/surgical treatment claims. 29 U.S.C. § 1185a(a)(3)(A)(ii).

60.   MHPAEA makes unlawful the imposition of both quantitative and non-quantitative mental health treatment limitations. 29 C.F.R. § 2590.712(a). Impermissible nonquantitative treatment limitations include clinical guidelines or standards limiting or excluding benefits based on medical necessity within any given classification level of treatment that are more stringently developed and applied to mental health and substance use disorder claims in comparison to the analogous medical/surgical claims at the same classification level of treatment. 29 C.F.R. §§ 2590.712(c)(4)(i) & (ii)(A).

### Illinois State Parity Law

61.   The State of Illinois imposes statutory requirements that parallel MHPAEA and render health plan provisions or practices that result in disparate and inferior coverage for mental health treatment unlawful. 215 ILCS 5/370c.1. For example, group healthcare plans covering Illinois state employees, retirees, and their dependents, such as the Illinois Plan, must include "treatment

15

limitations applicable to such mental, emotional, nervous, or substance abuse disorder or condition benefits [that] are no more restrictive than the predominant treatment limitations applied to substantially all hospital and medical benefits covered by the policy" and cannot include "separate treatment limitations that are applicable only with respect to mental, emotional, nervous, or substance use disorder or condition benefits." 215 ILCS 5/370c.1(a)(2). Illinois law also requires the following:

> With respect to mental, emotional, nervous, or substance use disorders or conditions, an insurer shall use policies and procedures for the election and placement of mental, emotional, nervous, or substance use disorder or condition treatment drugs on their formulary that are no less favorable to the insured as those policies and procedures the insurer uses for the selection and placement of drugs for medical or surgical conditions and shall follow the expedited coverage determination requirements for substance abuse treatment drugs set forth in Section 45.2 of the Managed Care Reform and Patient Rights Act.

215 ILCS 5/370c.1(d).

### Clinical Guidelines Utilized by Magellan

62. Magellan, on its own behalf and on behalf of the Illinois Plan, denied R.L.'s, D.D.'s and other class members' claims for residential treatment based on a conclusion that the claimants did not meet the applicable clinical guidelines, specifically the "MCG Health Behavioral Health Care 22nd Edition: Residential Behavioral Health Level of Care, Child or Adolescent" ("MCG Guidelines").

63. The MCG Guidelines were drafted by an organization that provides consultation services in return for substantial remuneration to insurers and administrators such as Magellan; and the MCG Guidelines are focused more on cost savings than on providing treatment guidelines that are consistent with generally accepted standards of medical care and treatment and which assess each patient's individualized curicumstances.

64. Furthermore, the standards contained in the MCG Guidelines utilize acute care requirements for sub-acute treatment placement, and impose treatment standards that are more restrictive and limiting than sub-acute medical necessity standards utilized by the Illinois Plan for medical and surgical treatment that includes, but is not limited to, facilities providing residential rehabilitation treatment, hospice care, or skilled nursing care. Indeed, the Illinois Plan's use of Magellan to administer only behavioral health claims while Aetna administers all other medical and surgical treatment creates a bias against mental health treatment consistent with the well-accepted finding that separate but equal is inhererently unequal – *Brown v. Board of Education of Topeka, KS,* 347 U.S. 483 (1954).

65. The MCG Guidelines, as applied, are also inconsistent with numerous generally accepted standards of mental health care and medical-surgical care, as identified in *Wit v. United Behavioral Health*, No. 14-cv-02346, 2019 WL 1033730, 2019 U.S. Dist. LEXIS 35205 (N.D. Cal., March 5, 2019), including, but not limited to the following:

> "It is a generally accepted standard of care that effective treatment requires treatment of the individual's underlying condition and is not limited to alleviation of the individual's current symptoms."

> "It is a generally accepted standard of care that effective treatment requires treatment of co-occurring behavioral health disorders and/or medical conditions in a coordinated manner that considers the interactions of the disorders and conditions and their implications for determining the appropriate level of care."

> "It is a generally accepted standard of care that patients should receive treatment for mental health and substance use disorders at the least intensive and restrictive level of care that is safe and effective." However, "the fact that a lower level of care is less restrictive or intensive does not justify selecting that level if it is also expected to be less effective."

> "It is a generally accepted standard of care that when there is ambiguity as to the appropriate level of care, the practitioner should err on the side of caution by placing the patient in a higher level of care."

17

"It is a generally accepted standard of care that effective treatment of mental health and substance use disorders includes services needed to maintain functioning or prevent deterioration."

"It is a generally accepted standard of care that the appropriate duration of treatment for behavioral health disorders is based on the individual needs of the patient; there is no specific limit on the duration of such treatment."

"It is a generally accepted standard of care that the unique needs of children and adolescents must be taken into account when making level of care decisions involving their treatment for mental health or substance use disorders."

"It is a generally accepted standard of care that the determination of the appropriate level of care for patients with mental health and/or substance use disorders should be made on the basis of a multidimensional assessment that takes into account a wide variety of information about the patient."

66. By failing to apply clinical care criteria consistent with generally accepted standards of medical care and treatment, R.L., D.D., along with the other class members, were denied the protections afforded by the Federal and Illinois State parity laws and their right under color of law to receive due process in the adjudication of her benefit claim on account of Defendants' use of flawed and overly restrictive clinical guidelines. Magellan's benefit determinations on its own behalf, and on behalf of the Illinois Plan, were therefore inherently unreasonable and must be overturned.

## RELIEF SOUGHT

WHEREFORE, Plaintiffs pray for the following relief:

A. That the Court determine and then declare that the use of clinical criteria for residential treatment guidelines contained in the MCG Guidelines in a manner that is inconsistent with generally accepted standards of medical care and treatment and are more restrictive and impose more strict requirements on mental health treatment than guidleines for comparable medical and/or surgical treatment violates the MHPAEA and the State of Illinois parity laws;

  B. That the Court issue an injunction ordering CMS and Magellan to cease mechanically applying the MCG Guildelines in all cases and to instead determine medical necessity of mental health treatment in a manner that is consistent with generally accepted standards of medical care and treatment;

  C. That the Court overturn Magellan's denial of coverage for R.L.'s D.D.'s and the other class members' residential treatment claims;

  D. That the Court award Plaintiffs' their attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

  E. That the Court award Plaintiffs any and all other relief to which they may be entitled, including interest on the medical payments Defendants forced them to make.

Dated: July 6, 2020             Respectfully submitted,

                       /s/ Mark D. DeBofsky

                       Mark D. DeBofsky
                       One of the Attorneys for Plaintiffs

Mark D. DeBofsky
DeBofsky Sherman Casciari Reynolds, P.C.
150 North Wacker Drive, Suite 1925
Chicago, Illinois 60606
Voice: (312) 561-4040
Fax: (312) 929-0309
Email: mdebofsky@debofsky.com