UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |
|---|---|
| M.F., on behalf of R.L. and P.L., and S.D. and D.D., | |
| Plaintiffs, | No. 20 CV 3928 |
| v. | Judge Manish S. Shah |
| MAGELLAN HEALTHCARE INC., JANEL FORDE, and TIM MCDEVITT, | |
| Defendants. | |

MEMORANDUM OPINION AND ORDER

As State of Illinois employees, P.L. and S.D. received healthcare coverage under a state-sponsored, self-funded plan. Their respective children, R.L. and D.D., suffered serious mental health conditions and required treatment at residential facilities. Magellan Healthcare Inc., a private company that administered the mental health benefits under the Illinois Plan, denied coverage for most of R.L.'s and D.D.'s respective treatments. The plaintiffs filed this lawsuit against Magellan and two state employees from the Illinois Department of Central Management Services, alleging that by denying coverage, the defendants violated their constitutional rights to due process under Section 1983 and their rights under federal and state mental health parity laws. The defendants filed motions to dismiss the plaintiffs' second amended complaint. The parties fully briefed Magellan's motion, but the plaintiffs responded to the state defendants' motion by seeking leave to file a third amended complaint. Because the plaintiffs fail to state a claim for due process violations under

the U.S. Constitution and do not have a private right of action under the mental health parity laws, the defendants' motions to dismiss are granted. Since the proposed complaint does not change this analysis, the plaintiffs' motion for leave to file a third amended complaint is denied as futile.

## I.      Legal Standard

To survive a motion to dismiss for failure to state a claim, a complaint must contain a short and plain statement that plausibly suggests the violation of a legal right. Fed. R. Civ. P. 8(a)(2), 12(b)(6); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556–58 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009). I accept the plaintiffs' factual allegations as true and draw all reasonable inferences in their favor. *Iqbal* at 678–79. I do not accept allegations that are unsupported, conclusory, or legal conclusions. *Id.* At this stage of the case, I may only consider allegations in the complaint, documents attached to the complaint, documents that are both referred to in the complaint and central to its claims, and information that is subject to proper judicial notice. *Reed v. Palmer*, 906 F.3d 540, 548 (7th Cir. 2018).

## II.      Facts

The State of Illinois sponsors a self-funded healthcare plan called the Illinois Plan that provides healthcare coverage to state employees, retirees, and their dependents. [25] ¶ 9.[1] The state hired Magellan Healthcare Inc., a private corporation, to administer the mental health benefits offered under the plan. [25] ¶ 8.

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are from the CM/ECF header placed at the top of filings. The operative complaint is the second amended complaint. [25].

P.L. and S.D. worked for the State of Illinois, so their respective children, R.L., a minor, and D.D., now an adult, received healthcare coverage under the plan. [25] ¶¶ 4–6. P.L. assigned power of attorney to her wife, M.F., who filed this lawsuit on behalf of P.L. and their minor child, R.L. [25] ¶ 4.[2]

R.L. was diagnosed with disruptive mood dysregulation disorder, autism spectrum disorder, attention deficit hyperactivity disorder, and reading and learning disorders. [25] ¶ 26. These mental and behavioral issues led R.L. to threaten a sibling with bodily harm and destroy personal property at home. [25] ¶ 26. Some of her outbursts required police intervention, and R.L. directed violent behavior towards law enforcement officers and others. [25] ¶ 26. Because of her medical issues, she received inpatient and outpatient treatment. [25] ¶ 26. But this treatment failed to improve R.L.'s mental condition. [25] ¶ 27. She exhibited suicidal ideation, possible

---

[2] There is a presumption that litigants' identities are public information because the "people have a right to know who is using their courts." *Doe v. Blue Cross & Blue Shield United of Wisconsin*, 112 F.3d 869, 872 (7th Cir. 1997); *see also* Fed. R. Civ. P. 10(a) ("the complaint must name all the parties"). The use of initials or pseudonyms for litigants is disfavored, and judges have an independent duty to determine whether fictitious names are allowed. *Doe*, 112 F.3d at 872. Here, the plaintiffs use initials for the adult parents, M.F., P.L., and S.D., and the children, R.L., a minor, and D.D., an adult. Courts must protect the privacy of minors, and "the right way to provide anonymity is to use [their] initials." *E.A. v. Gardner*, 929 F.3d 922, 926 (7th Cir. 2019) (citing Fed. R. Civ. P. 5.2(a)(3)). However, M.F., P.L., S.D., and D.D. must demonstrate that there are "exceptional circumstances" that justify the use of fictitious names for adult parties. *Id.* (citations omitted). R.L. is the child of M.F. and P.L. [25] ¶ 4. Naming one or both of R.L.'s parents risks revealing R.L.'s identity, so to protect R.L.'s privacy, *see* Fed. R. Civ. P. 5.2(a)(3), the use of M.F.'s and P.L.'s initials is justified in this case. While technically an adult, D.D. is still a teenager. *See* [25] ¶ 33. Medical issues are typically not sufficient to permit the use of fictitious names for adults but here the complaint alleges that D.D. engaged in sometimes illegal conduct due to serious behavioral issues. *Cf. Doe*, 112 F.3d at 872 (common medical disorders do not justify concealing a party's identity). Consequently, exceptional circumstances justify using initials to identify D.D., even though D.D. is an adult. And because naming D.D.'s parent risks revealing D.D.'s identity, the use of S.D.'s initials is also justified in this case. For these reasons, I refer to all plaintiffs by their initials.

substance abuse, and dangerous sexual behavior, "with a complete lack of insight and coping skills." [25] ¶¶ 27, 42, n.1. R.L. was then placed in an intensive out-of-state therapy program. [25] ¶ 27. After the program ended, she went to a therapeutic boarding school but was discharged due to violent outbursts, including attacking staff members and threatening other students. [25] ¶ 27. R.L. was then admitted to a licensed and accredited out-of-state residential behavioral health treatment center with an academic component. [25] ¶¶ 27–28. Magellan deemed the treatment medically necessary and approved coverage. [25] ¶ 29.

After about a month, Magellan terminated R.L.'s benefits. [25] ¶ 29. She had yet to complete treatment and was not capable of functioning at a less intensive level of treatment without posing a significant risk of self-harm and harm to others. [25] ¶ 29. However, Magellan determined that R.L.'s treatment was no longer medically necessary based on the MCG Guidelines, a treatment and care guideline published by a third-party medical consulting company. [25] ¶¶ 29, 63. Her family tried to appeal the decision but Magellan was uncooperative. [25] ¶ 31. M.F., P.L., and R.L. also allege that the Illinois Department of Central Management Services (CMS) initially deferred R.L.'s appeal to Magellan. [25] ¶ 31. More than seven months after the denial, R.L.'s family was able to submit an appeal to Magellan. [25] ¶ 32. About two months later, she received a decision from a third-party, the Medical Review Institute of America, upholding the denial of coverage based on the MCG Guidelines. [25] ¶ 32.

4

D.D.'s angry and defiant behavior started in his preteens. [25] ¶ 33. He started abusing alcohol and using marijuana and attended school drunk or high. [25] ¶ 33. He expressed suicidal threats and tendencies. [25] ¶ 33. His condition worsened, and he began engaging in other risky and violent behavior, including experimenting with hallucinogens. [25] ¶ 33. While D.D. initially saw a therapist, he became unreceptive to therapy. [25] ¶¶ 33–34. D.D. went to the emergency room after a suicidal threat, and received outpatient treatment and prescriptions for anti-depressants. [25] ¶ 34. But his behavior did not change, and he refused to take medication. [25] ¶ 34. D.D. continued to use drugs, make suicidal threats, and occasionally perform violent and destructive acts. [25] ¶ 34. Because D.D. had multiple mental disorder diagnoses, including substance abuse disorders, but refused therapy, medication, and drug rehabilitation services, his pediatrician advised that it was medical necessary for D.D. to go to an outdoor treatment facility, followed by a long-term placement. [25] ¶¶ 35, 42. His psychologist agreed. [25] ¶ 35. D.D. went to an outdoor treatment program for about two and a half months, and was then placed in a residential treatment facility for about nine months, where he underwent treatment successfully. [25] ¶ 36.

Magellan denied coverage for the outdoor treatment program, claiming it never received his treatment records in order to determine whether the services were medically necessary. [25] ¶ 37. D.D. and S.D. allege that this explanation was a lie. [25] ¶ 37. Magellan reopened D.D.'s claim for the outdoor treatment program but never provided a decision on the medical necessity of the treatment, foreclosing his

ability to appeal. [25] ¶¶ 38–39. Instead Magellan attempted to settle the claim for pennies on the dollar. [25] ¶ 39. Magellan authorized D.D.'s treatment at the residential facility for approximately two weeks but did not cover the rest of his stay, even though he had not completed treatment after two weeks. [25] ¶¶ 40–41. Magellan's denial was based on the MCG Guidelines. [25] ¶ 42. Magellan also claimed that the residential treatment facility failed to provide the necessary documentation to approve continued coverage, which D.D. and S.D. allege was another lie. [25] ¶ 43. D.D. and S.D. appealed the denial of coverage for the residential treatment facility and allege that Magellan forced them to appeal through Magellan's procedures, even though the Illinois Plan required CMS to adjudicate the appeal. [25] ¶ 44.

In the operative complaint, the plaintiffs allege that the Illinois Plan covered "medically necessary" behavioral healthcare, which was defined as behavioral services that a healthcare provider, who was exercising prudent judgment in accordance with generally accepted standards of medical practice, would provide. [25] ¶¶ 8, 49–50. "Medically necessary" services had to be clinically appropriate, cost-effective, not offered primarily for the convenience of the patient, physician, or other healthcare provider, and consistent with any applicable federal or state laws. [25] ¶¶ 8, 49–50. According to the plaintiffs, the MCG Guidelines, which Magellan used for child or adolescent behavioral care, conflicted with generally accepted standards of care. [25] ¶¶ 55, 62–64. Specifically, the plaintiffs allege that the MCG Guidelines applied standards for acute care when assessing sub-acute behavioral health situations and that the MCG Guidelines were more focused on cost savings than

6

covering appropriate treatment. [25] ¶ 64. The plaintiffs also allege that under the Illinois Plan, acute-care standards did not apply to individuals requiring sub-acute treatment for other medical or surgical issues. [25] ¶ 64. In other words, a more stringent medical criterion was used for sub-acute patients seeking behavioral healthcare treatment than for sub-acute patients seeking other types of treatment— like medical or surgical healthcare—even when that treatment involved analogous services such as residential rehabilitation treatment, hospice care, or skilled nursing care. [25] ¶ 64. The plaintiffs also allege that under the Illinois Plan, appeals of claim denials had to be submitted to CMS, and that Magellan notified R.L. of this process. [25] ¶¶ 31, 44. Finally, the operative complaint cites one state statute, which states that medical necessity determinations for substance use disorders must "be made in accordance with appropriate patient placement criteria established by the American Society of Addiction Medicine. No additional criteria may be used." 215 ILCS § 5/370c(b)(3).[3]

Magellan attached the Illinois Plan document to its brief, and the plaintiffs do not dispute its authenticity. [28-1].[4] The language in the plan is different than the allegations in the operative complaint. The plan only covered behavioral health services deemed medically necessary by the plan administrator. [28-1] at 42. The plan

---

[3] A district court can take judicial notice of state statutes because they are matters of public record. *Demos v. City of Indianapolis*, 302 F.3d 698, 706 (7th Cir. 2002).

[4] I can consider the document because the Illinois Plan is referenced in the plaintiffs' complaint and is central to the plaintiffs' claims. *See Venture Associates Corp. v. Zenith Data Systems Corp.*, 987 F.2d 429, 431 (7th Cir. 1993) (a defendant may introduce a critical document if the plaintiff failed to do so).

document stated that coverage of behavioral health services complied with the federal Mental Health Parity and Addiction Equity Act of 2008. [28-1] at 42. Preauthorization for behavioral treatment was required. [28-1] at 42. The plan described the following appeals process if a claim was denied: first, plan participants had to appeal internally to the plan administrator. [28-1] at 67. If the internal appeal failed, the plan participant could file an external appeal. [28-1] at 68. CMS handled appeals of claims that did not involve medical judgment, and an independent external review entity reviewed appeals of claims that involved medical judgment. [28-1] at 67–68.

After being denied coverage, M.F., P.L., R.L., S.D., and D.D. filed this lawsuit, on behalf of themselves and all others similarly situated, against Magellan and Janel Forde and Tim McDevitt, two leaders at CMS. [1].[5] Magellan filed a motion to dismiss. [19]. The plaintiffs responded by filing a first amended complaint, [21], and then a second amended complaint, [25]. In their second amended complaint, the plaintiffs allege that Magellan, Forde, and McDevitt violated plaintiffs' due process rights under § 1983 and their rights under federal and state mental health parity laws. [25]. The defendants filed motions to dismiss the second amended complaint. [27]; [40]. The parties fully briefed Magellan's motion to dismiss. [35]. In response to the state defendants' motion, the plaintiffs filed a motion for leave to file a third amended complaint. [43]. The proposed third amended complaint elaborates on the

[5] Forde is the current Director of CMS; McDevitt is the former director and is no longer with the department. [40] at 2, n.1.

8

plaintiffs' previous claims and seeks to add five new individual defendants, a conspiracy theory for state action, a *Monell* claim against Magellan, and an intentional infliction of emotional distress claim under state law. [43].

## III.   Analysis

Under Section 1983 of the Civil Rights Act, injured parties can sue a "person" who, under color of state law, deprives them of their rights under the U.S. Constitution or federal laws. 42 U.S.C. § 1983. A "person" can include private corporations. *Shields v. Illinois Dept. of Corrections*, 746 F.3d 782, 789 (7th Cir. 2014). To state a due process violation, the plaintiffs must allege that 1) they were deprived of a protected interest in property or liberty and 2) the government's procedures failed to comport with due process. *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999) (citing U.S. Const. amend. XIV). A property or liberty interest must arise from an independent source, such as a contract, statute, or regulation; it must operate as a "free-standing entitlement"; and it must be substantive rather than procedural in nature. *Lavite v. Dunstan*, 932 F.3d 1020, 1032–33 (7th Cir. 2019); *Citizens Health Corp. v. Sebelius*, 725 F.3d 687, 694 (7th Cir. 2013). A benefit arising from state law is a secure and durable property right when a system of nondiscretionary rules governs the revocation or renewal of the benefit. *Chicago United Industries, Ltd. v. City of Chicago*, 669 F.3d 847, 851 (7th Cir. 2012). Illinois law presumes that its statutes do not create contractual or vested rights absent clear legislative intent. *People ex rel., Sklodowski v. State*, 182 Ill.2d 220, 231–32 (1998). When a protected interest exists, the government must provide adequate procedural safeguards, i.e.

due process, before taking that right away. U.S. Const. amend. XIV. At minimum, the government must provide adequate notice, an opportunity for the interested party to be heard, and a decision by a neutral decision maker. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985); *Withrow v. Larkin*, 421 U.S. 35, 46–47 (1975). The exact requirements vary by proceeding. *Hannah v. Larche*, 363 U.S. 420, 440 (1960); *see also Mathews v. Eldridge*, 424 U.S. 319, 335 (due process is a flexible concept that balances the private interest affected by the official action; the risk of an erroneous deprivation; the probable value of additional or different procedural safeguards; and the government's interest). When the property interest arises from a contract with a public body, the only process due "is the opportunity to seek damages from a state court." *Linear v. Village of University Park, Illinois*, 887 F.3d 842, 844 (7th Cir. 2018).

The plaintiffs broadly allege that "the State of Illinois' statutes, administrative regulations, practices and policies" establish their right to medically necessary healthcare coverage in accordance with generally accepted standards of care. [25] ¶ 52. The operative complaint also references 215 ILCS § 5/370c(b)(3), which states that medical necessity determinations for substance use disorders must be made in accordance with criteria established by the American Society of Addiction Medicine. [25] ¶ 42. The plaintiffs cite other state laws and regulations in support of their proposed third amended complaint. [45] at 3. *See e.g.* 215 ILCS § 5/356z.33 (requiring the Illinois Department of Insurance to define medical necessity for treatment models for early treatment of serious mental illnesses); 50 ILAC § 2035.30 (requiring

10

nonfederal government payors to conform to certain medical necessity criteria for utilization review of treatment models for serious mental illnesses for individuals under age 26).

Plaintiffs' allegations do not plausibly suggest a free-standing property right to a durable item called "medical coverage based on generally accepted standards of care." The claim is that the state vested benefits—created secure and durable entitlements—by requiring coverage for medically necessary treatment and providing criteria for necessity. But medical necessity, even when cabined by criteria, remains subject to discretionary judgment. For example, plaintiffs allege that deciding whether treatment is medically necessary requires the exercise of prudent judgment and the application of generally acceptable standards of care. The Department of Insurance's regulation for medical necessity for one type of treatment requires individualized planning that is "appropriate to the individual's changing condition" among other flexible criteria. 50 ILAC § 2035.30(a)(2)(C). Although the state may have created a vested right to healthcare benefits, plaintiffs' theory depends on a more specific property right: a vested right to coverage for medically necessary treatment with a definition of necessity that is discretionary (albeit subject to professional standards). *See Hussey v. Milwaukee Cty.*, 740 F.3d 1139, 1143 (7th Cir. 2014) (exact nature of claimed property right must be ascertained). What plaintiffs describe is not specific and durable. At most the state set standards to guide the discretionary judgment applied when deciding whether treatment is medically necessary. This is not a substantive property right. *See Linear*, 887 F.3d at 844

("procedural rights based on a contract … have nothing to do with the Due Process Clause, which protects substantive interests—rights in life, liberty, or property—rather than state-created procedures.").

Moreover, the plan document contradicts the plaintiffs' allegations and states that coverage only extends to treatment that meets Magellan's medical necessity criteria—not generally accepted standards of care. [28-1] at 42. This benefit is too contingent on Magellan's discretion to establish a secure and durable property right. The plaintiffs' medical benefits only vest after Magellan's approval. Thus, the plaintiffs' property interests are more like those in *Sullivan*, where the employees' right to medical treatment under state law vested only after a third-party determined that the treatment was reasonable and necessary. 526 U.S. at 60–61. Under the plan document, [28-1], the property interest would be in the healthcare benefit, not in the coverage-determination process. If Magellan's medical necessity criteria is subject to and not in compliance with different state laws or regulations, that is not a deprivation of property.[6] Unlike other litigants who survived the pleading stage by identifying statutory provisions that potentially created a property interest in state health insurance benefits, *see e.g. Durham v. Martin*, 388 F. Supp. 3d 919, 942 (M.D.

_____

[6] The cases cited by the plaintiffs, where courts held that the MCG Guidelines were inconsistent with generally accepted standards of care, support this conclusion. All of those cases were denial of benefit claims under ERISA, where the courts assessed whether the terms of the insurance plan covered the benefit. *See Jessica U v. Health Care Service Corp.*, 2020 WL 6504437 (D. Mont. 2020); *Wit v. United Behavioral Health*, 2019 WL 1033730 (N.D. Cal. 2019); *Charles W. v. Regence BlueCross BlueShield of Oregon*, 2019 WL 4736932 (D. Utah 2019), *order clarified*, 2020 WL 1812372 (D. Utah 2020); *H.N. v. Regence BlueShield*, 2016 WL 7426496 (W.D. Wash. 2016). Denial of benefit claims are analogous to (and duplicative of) breach of contract claims, *see Vallone v. CNA Financial Corp.*, 375 F.3d 623, 639 (7th Cir. 2004), not constitutional due process claims.

Tenn. 2019); *Jackson v. Roslyn Bd. of Educ.*, 652 F. Supp. 2d 332, 343 (E.D.N.Y. 2009), the plaintiffs here have failed to establish a guaranteed benefit of healthcare coverage in accordance with generally accepted standards of care.

Even assuming that the plaintiffs were deprived of a property right (and that Magellan was a government actor), neither the operative nor proposed amended complaint pleads a due process violation. The plaintiffs argue that they were denied adequate procedural protections because Magellan did not follow the appeals procedures set forth in the Illinois Plan and did not allow the plaintiffs to appeal their claims to CMS. The failure to follow procedures set by state law or contract is not a violation of the Constitution. *See Linear*, 887 F.3d at 844 (failing to follow procedures established by state law does not violate the federal Constitution). Moreover, the complaint does not plausibly allege a failure to follow proper procedure. The plan document established that Magellan reviewed appeals first. [28-1] at 67.[7] If the appeal failed, an independent external party performed the next level of review for claims involving medical judgment. [28-1] at 67–68.[8] CMS reviewed claims that did not involve medical judgment. [28-1] at 67–68. And the complaint alleges some (possibly truncated) pre-deprivation process, since plaintiffs submitted claims, at times had coverage approved, and Magellan reviewed their claims prior to denial or settlement. [25] ¶¶ 29, 37, 41, 43. After the denials, and consistent with the plan's

---

[7] This fact undermines the plaintiffs' allegation that CMS "deferred" R.L.'s appeal to Magellan, [25] ¶ 31, since Magellan, not CMS, was responsible for reviewing appeals first.

[8] This explains why R.L. received a decision from the Medical Review Institute of America. [25] ¶ 32.

published procedures, the plaintiffs were able to internally appeal their residential facility claims to Magellan, [25] ¶¶ 32, 44, and R.L. was able to obtain an external review. [25] ¶ 32.[9]

And even if Magellan corrupted the internal appeals process by not cooperating or lying, [25] ¶¶ 31, 37, 43, the plaintiffs still had adequate post-deprivation procedures in state court, which the plaintiffs don't appear to have used. *See Linear*, 887 F.3d at 844; *see also Tucker v. City of Chicago*, 907 F.3d 487, 492 (7th Cir. 2018) (plaintiffs who forgo their right to pursue post-deprivation remedies face a high hurdle in establishing a due process violation). The plaintiffs do not plausibly allege that the pre- and post-deprivation procedures they received failed to comply with due process.

Under § 1983, a private corporation can be sued for a constitutional violation when it acts under the "color of state law" and a company policy, custom, or practice caused the violation. *Shields*, 746 F.3d at 789. The "color of state law" requirement limits § 1983 defendants to those that use their governmental authority to misuse state power. *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 929 (1982). The requirement encompasses the state action requirement under the Fourteenth Amendment, *id.* at 935–36, so alleging state action is sufficient to allege that the defendants acted under color of law. The plaintiffs must show that 1) the deprivation was caused by acts pursuant to state law, a state rule, or a state authority figure and

---

[9] Since R.L.'s and D.D.'s claims involved medical judgment, CMS was never required to review their appeals under the terms of the plan.

that 2) the defendants were state actors. *Id.* at 937. Here, the first element is met because private managed care organizations like Magellan act "with the knowledge of and pursuant to" state laws and regulations. *See Sullivan*, 526 U.S. at 50 (citations omitted) (concluding that private insurers, which operate in a heavily regulated industry, act in accordance with state law). For the second element, various tests are used to determine whether defendants are state actors, which means that their conduct is "fairly attributable to the state." *Lugar*, 457 U.S. at 937–39. Under the "close nexus" test (also known as the "command/encouragement" test), courts analyze whether the state exercised coercive power over the private business, or provided significant encouragement to it. *Sullivan*, 526 U.S. at 52. Under the joint participation test, plaintiffs must demonstrate that state officials worked together with the defendants. *Id.* at 58. Under the public function test, courts determine whether the state delegated powers that were traditionally and exclusively reserved to the state to a private entity. *Id.* at 55. There are no per se rules for determining state-actor status and the inquiry is fact-specific. *Lugar*, 457 U.S. at 939.

The plaintiffs' operative complaint, [25], fails to allege state action. Magellan did not stand in the state's shoes—the plan allowed Magellan to use its own criteria for medical necessity. [28-1] at 42. There are no allegations that the state requirements replaced Magellan's exercise of independent medical judgment. At most, and as the plaintiffs allege, Illinois deferred to Magellan's use of the MCG guidelines. [25] ¶ 52. Mere approval or acquiescence by the state is insufficient to turn private action into state action. *Sullivan*, 526 U.S. at 52. The plaintiffs'

allegation that Magellan took over the state's role in reviewing appeals, [25] ¶¶ 31, 44, conflicts with the plan document, which states Magellan reviewed appeals first and independent external entities—not CMS—reviewed appeals of claims involving medical judgment. [28-1] at 67–68; *cf. Sullivan*, 526 at 54 (allegations of a private company replacing a state created and supervised dispute resolution mechanism are sufficient to allege state action). Nor do the plaintiffs point to any historical practice where establishing standards of care and administering healthcare benefits to state employees, retirees, and their dependents was within the sole province of the state. *See Sullivan*, 526 at 55 (under the public function doctrine, courts analyze whether the state delegated a constitutional or statutory obligation and what the state's historical practice with respect to that function was); *see also Manhattan Community Access Corporation v. Halleck*, 139 S.Ct. 1921, 1929 (2019) (holding that very few functions have been traditionally and exclusively reserved to the states).[10] The operative complaint does not allege that Magellan acted under color of state law.

The plaintiffs also bring suit against Forde and McDevitt in their individual capacities. [25] ¶ 7. To allege individual liability under § 1983, the plaintiffs must allege that Forde and McDevitt were personally involved in the alleged constitutional deprivation. *See Johnson v. Rimmer*, 936 F.3d 695, 710–11 (7th Cir. 2019). Examples of personal involvement include participating directly in the alleged violation,

---

[10] And unlike *Golbert v. Aurora Chicago Lakeshore Hospital, LLC, et al.*, No. 19-CV-08257, 2021 WL 952528, at *5 (N.D.Ill. 2021), the plaintiffs were not under guardianship or in state custody such that Magellan was performing acts that the state would otherwise be required to perform.

knowing about the conduct, facilitating the conduct, approving the conduct, condoning it, or turning a blind eye to it. *Rasho v. Elyea*, 856 F.3d 469, 478 (7th Cir. 2017). The complaint states that Forde and McDevitt "approved, encouraged and/or ratified" Magellan's use of the MCG Guidelines. [25] ¶ 54. This allegation is too conclusory to plausibly allege that Forde and McDevitt were personally involved. *See Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").[11] The plaintiffs fail to allege that Forde or McDevitt were personally involved in administering the claims of R.L. or D.D.[12]

The plaintiffs do not seek specific relief under federal and state mental health parity laws. [32] at 3. Instead they seek a declaratory finding that Magellan violated both federal and state parity requirements by imposing more stringent guidelines for behavioral treatment compared to medical and surgical treatment.[13] To obtain declaratory relief under federal law, the plaintiffs must have a predicate right of

---

[11] The plaintiffs also fail to clearly allege the relief that they seek against the individual defendants. *See* [25] ¶¶ 7, 56(A)–(E). "[S]ection 1983 does not permit injunctive relief against state officials sued in their individual as distinct from their official capacity." *Greenawalt v. Indiana Dept. of Corrections*, 397 F.3d 587, 589 (7th Cir. 2005).

[12] Instead of responding to the individual defendants' motion to dismiss, [40], the plaintiffs sought permission to amend the complaint, [43], and did not brief the arguments raised by Forde and McDevitt. The plaintiffs submitted supplemental authority, [48-2], to suggest personal involvement by the state defendants, but that case is distinguishable because it had more than one conclusory allegation of personal involvement. *See Golbert v. Aurora Chicago Lakeshore Hospital, LLC, et al.*, No. 19-CV-08257, 2021 WL 952560, at *5–6 (N.D.Ill. 2021).

[13] The Mental Health Parity and Addiction Equity Act requires employer-sponsored group health plans to provide the same aggregate benefits for mental healthcare as they do for medical and surgical benefits. *See* 29 U.S.C. § 1185a(a)(3); 42 U.S.C. § 300gg–5(a)(3); 26 U.S.C. § 9812(a)(3). Illinois's mental health parity law is interpreted as consistent with the federal act. *See* 215 ILCS § 5/370c.1(e).

action. *Alarm Detection Systems, Incorporated v. Orland Fire Protection District*, 929 F.3d 865, 871, n.2 (7th Cir. 2019) (declaratory relief "presupposes the existence of a judicially remediable right") (quoting *Schilling v. Rogers*, 363 U.S. 666, 677 (1960)).[14] The Mental Health Parity and Addiction Equity Act does not have its own enforcement provision. Instead, it is enforced through ERISA, the Public Health Service Act, and the Internal Revenue Code. *See* 29 U.S.C. § 1185a; 42 U.S.C. § 300gg–5; 26 U.S.C. § 9812. The plaintiffs concede that they cannot enforce the MHPAEA through ERISA because the Illinois Plan is exempt from ERISA. [31] at 14; 29 U.S.C. § 1003(b)(1); 29 U.S.C. § 1002(32); 5 ILCS § 375/1 *et seq*. The plaintiffs attempt to enforce the MHPAEA through the Public Health Service Act, but their one-sentence argument that "surely" the state isn't exempt from the PHSA, [32] at 15, is insufficient to establish that they have a private right of action under the PHSA. *See also* 42 U.S.C § 300gg–21; 45 C.F.R. § 146.180 (sponsors of self-funded, nonfederal governmental plans may opt out of certain requirements of the PHSA). Because the plaintiffs fail to identify an underlying private right of action, they cannot obtain declaratory relief for violations of the MHPAEA.[15]

---

[14] The Declaratory Judgment Act does not confer federal jurisdiction. 28 U.S.C. § 2201(a). It only permits declaratory relief when an independent basis for federal subject matter jurisdiction exists. *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671–72 (1950).

[15] While the plaintiffs argue that their parity allegations have withstood similar motions to dismiss, those cases are different because those plaintiffs could invoke ERISA's private enforcement mechanism. *See Michael W. v. United Behavioral Health*, 420 F.Supp.3d 1207, 1214 (D. Utah 2019); *Denise M., E.G. v. Cigna Health*, 2020 WL 3317994, at *1 (D. Utah 2020).

Similarly, the plaintiffs fail to establish whether Illinois's mental health parity law applies to Magellan as a managed care organization or the Illinois Plan as a self-funded insurance plan, and whether the law provides a private right of action. *Compare* 215 ILCS § 5/370c.1(a) (the act applies to an "insurer" or a "qualified health plan"), *with Petrovich v. Share Health Plan of Illinois, Inc.*, 188 Ill.2d 17, 28 (1999) ("managed care organizations have stepped into the insurer's shoes"); *see also* Joint Annual Report to the General Assembly, Illinois Department of Insurance and Illinois Department of Healthcare and Family Services (August 2020), https://insurance.illinois.gov/Reports/Special-Reports/IDOI-HFS-Annual-Report-Compliance-Mental-Health-and-Substance-Coverage-and-Parity-Laws-08-2020.pdf (Illinois MCOs managing Medicaid benefits were subject to mental health parity laws, which were enforced by two state agenices). The plaintiffs' cannot obtain declaratory relief under federal and state mental health parity laws.[16]

The plaintiffs filed a motion to amend their operative complaint. [43]. The proposed third amended complaint would add five new individual defendants: one Magellan employee and four CMS employees. [43-1] ¶¶ 10, 13–16. It includes new allegations of state action, specifically that Magellan conspired with CMS to deny expensive claims—by using the MCG guidelines and settling claims—to help balance the state budget. [43-1] ¶¶ 19–20, 32–37. The plaintiffs allege that Magellan delayed and then did not act upon the appeal for R.L.'s claim to avoid a large payout. [43-1]

---

[16] Because the plaintiffs fail to establish that they have a cause of action under federal or state mental health parity laws, I do not reach the issue of whether the defendants violated the mental health parity requirements.

¶¶ 44–46. The plaintiffs also state that CMS directed Magellan to settle part of D.D.'s treatment. [43-1] ¶¶ 36–37, 51–63. In addition to the plaintiffs' due process and mental health parity law claims, the plaintiffs want to add a conspiracy and *Monell* claim under § 1983 and a claim for intentional infliction of emotional distress under state law. [43-1]. The allegations of joint action, conspiracy, and individual participation are stronger in the third amended complaint. However, even if the plaintiffs were able to allege Magellan acted under color of state law and that the individual defendants were personally involved in the denial of coverage, the third amended complaint does not change the due process analysis. It does not contain new allegations about: a secure and durable property right in health benefits for medically necessary treatment; the internal and post-deprivation processes available to the plaintiffs; or whether the mental health parity laws provide a private right of action. Since there is no underlying deprivation of due process, the plaintiffs' proposed amended claims for due process, conspiracy, and *Monell* under § 1983 would fail. Without a private right of action, so would the plaintiffs' proposed claim under federal and state mental health parity laws. The plaintiffs' proposed IIED claim under state law would be relinquished with the dismissal of the federal claims. *See RWJ Management Co., Inc. v. BP Products North America, Inc.*, 672 F.3d 476, 480 (7th Cir. 2012). The proposed amendment is futile. *See Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago and Northwest Indiana*, 786 F.3d 510, 519–20 (7th Cir. 2015) (where futility is certain from the face of the complaint, amendment may be denied).

20

R.L. and D.D. required mental health treatment and the denial of coverage may have breached the plan and been contrary to appropriate medical judgment. But by framing their claims under § 1983 and federal and state mental health parity laws, plaintiffs have not advanced a plausible claim for relief in federal court. Since the plaintiffs cannot allege a due process violation or a private right of action, their claims based on these legal theories are dismissed with prejudice. *See id.*

## IV. Conclusion

The defendants' motions to dismiss, [27] and [40], are granted, and the plaintiffs' federal claims are dismissed with prejudice. The plaintiffs' motion for leave to file a third amended complaint, [43], is denied. The plaintiffs' motion to file supplemental authority, [48], is granted. Enter judgment and terminate civil case.

ENTER:

_____

Manish S. Shah
United States District Judge

Date: March 24, 2021